The next case scheduled for argument this morning is United States v. Skelos, numbers 183421 and 3442. I'm going to focus my argument on why Mr. Skelos is entitled to a new trial on all counts under this Court's recent decision in the United States against Silver. The jury instructions in this case are virtually identical to the ones in Silver in relevant respects, in that the district court failed to provide a new trial for Skelos, which failed to instruct the jury as to each count, that it had to find a particular specific and focused question or matter had to be identified at the time the official made a promise or accepted the payments. The government appears to have conceded that in its letter, 28-J letter, that the instructions were incorrect. So I'd like to focus on why the government cannot meet its burden of proving that this error was harmless beyond a reasonable doubt. It's absolutely critical to focus a little bit on the harmless error standard. The government appears to be proceeding in its letter and in its brief on essentially the assumption that this is a sufficiency standard, that inferences are to be drawn in their favor. That's wrong. We're not raising a sufficiency argument at all. And under the Supreme Court's decision in Nieder, the standard here is actually essentially a mirror image of the sufficiency standard, but from the defendant's perspective. In other words, whether a rational, properly instructed jury could have acquitted. And the Supreme Court said in Nieder that it the that requires a full examination of the record, and if at the end of that examination, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding, the court must, should not find the error harmless. And this Court adopted that standard as it had to in the Quattrone case, which is cited in the government's brief for a different point on 102, but I wanted to highlight that case because it's similar in that the defendant testified, which is unusual. So I'd like to just turn to each of the different alleged schemes and talk a little bit about how the record illustrates that there was evidence to support an improper legal theory under Silver and that the government made arguments that as an alternative to the other legitimate theory of official action based. Scalia. This is not a McDonald case, is it? I mean, this is more specific in terms of the actual, the quid pro quo side of it than the McDonnell was, right? We're talking about concrete official actions, steps that are taken, and that kind of thing, by the public official. And so these are official acts that are, were proved or, and were discussed. The timing of them was not clear, and the instructions said that you, this quid pro quo was to do these official acts as, as opportunities arise. But the, the various, the various acts that were, were, were sought by the, by the, by the nonpublic officials were discrete acts, so it's not a McDonnell case. Just to be clear, I think what Silver holds is that under McDonnell, a specific question or matter has to be identified at the relevant time. And the point here is that while the government purported to identify a particular type of legislation as to each of the schemes, there was also evidence of a, and we're not disputing sufficiency, but. But does it have to be at the time of the, of the, of the agreement, or does it have to be at the time of the benefit to the, to the wrongdoer? Well, Silver says both things in different places, actually. There's one part of the opinion where the Court says a particular question or matter must be identified at the time the official makes, accepts a payment, and there are other parts where they also talk about making a promise. But either way, our point still holds as to each of the three schemes. And. But the focus, my follow-up to Judge Walker would be that in each of the schemes there was a legislative purpose that was identified. This was not a just general help me out if I ever need help. This was, there is legislation that Mr. Skelos was in a position to either move along or to block. And so there were matters that were identified that would seem to me satisfy Silver as to a McDonnell kind of attack. Well, the point is that Silver also makes clear that it's not enough to just talk about legislation in a particular category. Footnote 22 in particular specifically says that supporting or developing real estate legislation is not sufficient and that it has to be tied to much more specifically. And my point is not, the government did have a theory tied to specific legislation, but there was also evidence and testimony, indeed, by two of the key supposed payers, the one at Glenwood and PRI, indicating that it really had a much more general thing in mind. So, for example, Anthony Bonomo said that he didn't fear anything specific, he just had an overall sense of anxiety. That's at Appendix 4388. But I'm going to interrupt for just a second, just looking at footnote 22. It says that a narrower definition that focuses on particular programs, tax abatement, rent stabilization programs, is required. So it's not just, and that's what was present here, it seemed to me, no? Your Honor, again, and I would ask, actually, if we could have an opportunity just very briefly to submit a written brief analyzing the impact of Silver, because I think this is very critical and there are parts of the record, and just as one example. I think that's an excellent idea. Yes. Why don't you each give us eight pages, double-spaced, on Silver. Because you'd be sequential, too. Sequential, yes. Why don't you go first and then the government will respond on the effect of Silver. Thank you, Your Honor. And within, what would you like, 10 days? 10 days for you and then 10 days for the government to respond. All right? Thank you. Thank you very much. So, no, go ahead. Take an extra minute or two. Just as an example, and what I want to emphasize, and we'll go through some of the more specific detail about the record in the brief, but what I want to emphasize is that the jury, the government gave the jury two different theories, and there was sufficient, what Nieder talks about is, is there sufficient evidence that the jury could have acquitted? And the reason they could have acquitted, had they been properly instructed, is that they could have, because of the timing, which was much more attenuated than in the Silver case, where the court was specifically focused on a side letter that was very close in time to these PACB approvals. So just as one example, this is at Appendix 6596, in its summation, the government says, Derego, that's the principal at Glenwood, told you Glenwood eventually figured out a way to pay Adam Skelos so that Dean Skelos would use his official actions to help the company and not harm it. Here is what he said. Question, why did you arrange for any of these payments to Adam Skelos? Answer, because I knew that the Senator was one of the most powerful people in State politics, and that any time he could do anything behind the scenes that would adversely impact our business, which would then put me in a very bad position at my own company. That is an illegal quid pro quo right there. And that's just an example. There are numerous other examples in the summation connected to the Abtex scheme, and there is similar evidence and argument with respect to the PRI scheme. But my point is that the jury could easily have convicted if they just believed that these people were helping Adam Skelos because Dean Skelos was a powerful politician in Albany and their company had legislative interests. And the silver opinion is clear that that's not sufficient. Sotomayor, thank you very much. We will hear from counsel for Adam Skelos. And also I would invite you to file your own separate brief about the effect of silver on that matter. I think we reserve the opportunity for you to do that. Certainly. Certainly. But let's keep the same schedule, please. You will both have ten days, and then the government has ten days to respond. Yes, that's fine with us. Great. Thank you. So I shall be briefer than I otherwise would have been. There is a primary point that I would like to make, and I am arguing for Adam Skelos, who was Dean Skelos' son. And that is addressing two of these transactions, one of which is PRI, which is the medical insurance company, malpractice insurance company, and the other is Glenwood, which is the construction of large rental apartment buildings. What's unique about Adam Skelos' position here is that there is no proof as to either of those that Adam was party to, present at, or knew about discussions which the government is arguing and which the conviction is based upon, that there would be legislative action. He simply wasn't present. There's no communication that indicates as to either of those that he was aware. And the government's case and its argument, and I'll turn to their argument because they put it in their brief, pre-Silver, the brief that they filed, is that he must have known because his father was his father, because they talked about politics, and so on. Does the record include statements by him about the power that his father had and the need that some of the entities had for his father's either approval or assistance in moving forward the legislation of issue? He didn't have any such conversations with either the PRI. How specific does his knowledge have to be? If he knows that his father is fixing things in one way or another, and as a result, he's getting benefits from that, why wouldn't that be sufficient? There isn't any evidence in the case which would support that. Well, by inference, what I'm saying, by inference, he is making statements. I'm sorry, Your Honor? Maybe not direct conversations, but by inference, the fact that his father is the benefactor that is causing him to get this money, and he's doing it, in effect, under the table. Why couldn't that much be inferred as to his knowledge? Let me answer that by quoting from the government's brief at page 64 through 67. This is in response to our argument pre-Silver that there was insufficient evidence on these two matters, and their response consists of the following. Adam Skelas had to have knowledge of the conspiracy's unlawful purpose, but not necessarily all of his activities. And we agree with that, and that is, I think, what Your Honor is saying. But what they rely on is Adam's intimate involvement in the crimes. So he doesn't have any intimate involvement in the crime, except that he performs or doesn't perform employment for PRI. Well, he accepts an envelope with $20,000, doesn't he, for no services rendered? He receives, yes, and that has to do with Glenwood. He has, there's just a few facts here that I need to underline. As to PRI, he does actually do business and goes out and gets arrangements with six hospital groups, which would be 1,000 doctors rather than one doctor taking premiums. And with regard to the insurance, that he actually has two agencies that he works with, which would be totally appropriate for him to do that. It doesn't have to be a no-show job. It can be a show job. Yes. An actual job. But the fact that he got the employment is the quid pro quo. Well, there has to be some evidence that he was aware that his father would be doing something which fulfills a Silver standard. And there isn't any evidence of that, except that he's his father. And the government relies on things like, and I'm quoting from 64, 65 through 67 of their briefs saying why there's sufficient evidence. During a too frequently discussed politics, Adam Skelos memorized his role in seeking state legislation. That has to do with ABTAC. But at ABTAC, he had a contract and he was hiring lobbyists. So it's a totally different context. That's why I'm only addressing the first two. He said at PRI, he said, you know, there's an arrangement between Dean Skelos and Bonomo. And the final one is the three schemes are temporally and factually related to one another. That's the extent of the government's proof. Now. And he told a supervisor when he reported to work at PRI, you know who I am right, and said there was an arrangement between Dean and Skelos and Bonomo. Yes, and that's consistent. An arrangement. That is absolutely consistent with his boorish behavior, his failure to show up, his rudeness to his employer. He did go to work. He did make arrangements for six different hospitals to go to. He did. And he also makes statements to a supervisor who complained that he wasn't showing up that were quite rude and suggested he didn't think he had to show up and that it was all arranged again. Yes. Our argument is that that is not reasonable. It's not a reasonable inference that therefore his father was putting a fix in on legislation. So following up on Judge Walker's question, what quantum of evidence? I mean, you'd want there to be some record evidence that he knew of particular legislation that was pending or that he had been part of a phone call that said give my son a job and I'll take care of this. Well, either of those. But Silver goes further than that. Silver holds affirms on one count because of the timeline which suggested that there was an act and then there was a, in the facts of that case, that there was an act and then there was a benefit. And in this case, you don't have that. And let me give you a quick example of that. You'll cover that in your letter. Sorry? You'll cover that in your letter. Sure. We can show you the. Silver, right? Well, PRI, he's hired. It'll take me a minute to take it out, so I'll just state it generally. But we can put it in the letter. And PRI, he takes the job. He performs. He's a bad employee and not a nice person. But he takes the job. PRI, the boss, finds out what's going on. They cut him back. They cut him back to half. They take him out of the position. Ultimately, they fire him. And after all that occurs, months after that, the extension statute that's relevant to the malpractice insurance is passed. But there's no time. There's no temporal relationship. And that, I think, would be the least they'd have to show, is that there was some something was happening. You know, you get the job. It's still slow. Do you think the leverage was coming from when his salary was bumped from 4,000 to 10,000 a month? I am sure it's coming from his father. But there are many fathers who help their sons and call up and say, couldn't you pay more, who are not fixing legislation at the same time. Too many of them are the majority leader of the Senate. That's true. But that, I submit, is not sufficient. There has to be another piece. It has to be a temporal piece. It has to be a suggestion. It has to be something other than the fact that, as the government says, he taught politics with his father. All right. Then we'll hear from the government and see what they have to say. Thank you so much. May I please the court? My name is Thomas McKay. I'm an assistant United States attorney in the Southern District. I represent the United States in this appeal, as I did at the trial. I'd like to start, if I may, with the first two points that Ms. Shapiro made regarding the jury instructions and the harmlessness standard. If you'd like to raise the podium so you're speaking more directly to the  Is that all right? Your Honor? I think that's a little better. Thank you, Your Honor. Thank you. So, first, with respect to the jury instructions, we do not concede that the instructions were erroneous on all counts. With respect to counts 1 through 5, the extortion and honest services instructions, we do concede they're erroneous in light of Silver. But we think that was harmless for reasons I'll discuss in a moment. But counts 6 through 8 charge violations of 18 U.S.C. section 666 under both a bribery and a gratuities theory. And we think those counts are not affected by Silver for two independent reasons. Remind me the number of those counts again. Six through eight. Six through eight. One of those is with respect to each of the three schemes. Right. So, with respect to the gratuities theory, this is straightforward. The jury convicted on a gratuities theory that simply did not include an as opportunities arise instruction. Rather, and there was a special verdict form, they were told they had to be unanimous as to bribery or gratuities, and they were unanimous as to both bribery and gratuities on each of those counts. The jury instructions on the gratuities count, which defense counsel has not challenged in their briefs, are very specific, consistent with Sundiamond and the gratuities case law, that the government must prove that there was a link between a thing of value conferred on Dean Skelos and a specific official act for or because of which he accepted the payment. That's at pages 69, 78, and 79 of the record. And so you just don't have this identification problem that exists in Silver because there was no as opportunities arise instruction on the gratuities counts. Defense counsel haven't challenged those jury instructions. They've argued that, generally speaking, 666 doesn't prohibit gratuities, but that's foreclosed by binding Second Circuit case law. So on that basis alone, you can affirm counts 6, 7, and 8. There's a separate independent reason you can affirm counts 6, 7, and 8, and that's because this Court held in the Englap-Singh case that McDonald's official act requirement simply doesn't apply in the context of section 666. And so to the extent that there was any error in the official act instruction, it would have been harmless in the sense that it raised the government's burden, which is essentially what the Court held in the Englap-Singh case. But moving on to my second, so for those two reasons, regardless of Silver, you can affirm counts 6, 7, and 8. Scalia. What about the argument Ms. Shapiro made on the specificity of the charges that the jury is entitled to based upon what was argued to the jury? Well, I think with respect to the gratuities count, in particular, that's just not correct. If you look at the jury instructions, they require a link to a specific official act. And if you look at our closing argument at page 6687 of the record, we distinguish between bribery and gratuities. We recite the applicable test in the gratuities context and argue that you have that here as well. And so even if you think there's a Silver problem, that just doesn't apply to counts 6 through 8. But with respect to counts 1 through 5, we think any error in the instructions was harmless beyond a reasonable doubt for the very same reasons in the Silver real estate scheme. And if I may, I want to just start with the harmlessness standard, because I think defense counsel in her argument and in her briefs have slightly mischaracterized the harmlessness analysis that applies here. It is not the case under Nieder that Nieder error is harmless only if the omitted element is uncontested. This Court held in United States v. Jackson that there's actually a two-part test that applies here. And that test has been reaffirmed time and again in Niedem, in Norrie, which is cited in our brief. And the two parts are as follows. First, you ask if there's sufficient evidence to support a defense finding. If the answer is yes, then you move to the second step, which is to look at whether the verdict, absent the error, would have been the same. Now, I read the defense arguments to be suggesting that you stop after the first step, but that's just not the way this Court's case law applies this analysis. And Silver is a perfect example of this. Kagan. But don't we have to be comfortable, though, that the jury would have found this way beyond a reasonable doubt? Yes, Your Honor, but that's the second step. And I'm just saying I take the defense argument to be, well, he testified, he denied it, and therefore he's not going to be able to prove it. I'm just saying a different way of reading the record evidence that raises a sufficient question that we can't be confident beyond a reasonable doubt that the jury would have so found as you're proposing. Your Honor, I think that the best way to analyze harmlessness is to look at exactly how the Court analyzed harmlessness in Silver and do the same thing here, because the similarities between the charges here and the Silver real estate scheme are remarkable. In the Glenwood scheme, for example, and each of our three schemes, I would say, that is true, each are focused on a very specific question or matter, and I can walk through what each of those matters are with respect to each scheme. First and foremost, with respect to the Glenwood scheme, the matter is the 421a and rent regulation legislation, which are the very same matters at issue in Silver. We had test and with respect, I mean, we think that the evidence of a quid pro quo and the identification of that matter was even stronger in this case than in Silver. We had testimony that time and again in meetings where Glenwood asked Dean Skelos to vote for them on 421a, he made requests to pay his son. And with respect to Judge Walker's question about timing, I think this is really important to look at the timing. On the Glenwood scheme, the votes on the Rent Act of 2011 come in June 2011. There's two meetings right before that. One in May 2011. Charlie Derego, the general counsel of Glenwood, who was our cooperating witness, met with both Adam and Dean Skelos and after numerous requests, which he had gotten by that point, agreed that Glenwood was going to find Adam Skelos a job with ABTEC. That's in May 2011. And Adam Skelos was present at that meeting. There's actually two different meetings, one between Derego and Adam and one between Derego and Dean. So he's present for the first of them. Then in June 2011, in Albany, in the State House, in the heat of the final negotiations over what's going to be in the Rent Act of 2011, Glenwood and its lobbyists and Derego are there meeting with Dean Skelos saying, here's what we need on 421A, here's where we can compromise on rent regulation. And in that meeting, Dean Skelos raises the promise to find Adam Skelos a job at ABTEC that had been made a month earlier. And he says, that's not going to work soon enough. He's not going to get paid soon enough. You need to find something else. And then just days later, Dean Skelos makes the vote. And so Judge Walker asked about whether it's the time he receives the benefit or the time of the agreement. I think we would submit that silver allows for either. And at that point in time, in June 2011, when Dean Skelos is about to vote on the bill and he raises this promise to get his son a job and ask for additional things as well, the corrupt bargain is struck there. And at that point in time, there can be no doubt at all about what the question or matter that Glenwood is thinking about is because it's the Rent Act of 2011, it's the 421A tax abatement and the rent regulation provisions that are being negotiated in that very same meeting where the ask is made. Ms. Shapiro read a passage from Charlie Derego about a more general sort of fear of legislative consequences. I think if you look at what the harmlessness analysis in silver, you'll see that almost identical testimony supports the harmlessness finding in silver. If you go through and compare the mesothelioma scheme and the real estate scheme in silver, you'll see mesothelioma is very, very different. Obviously, the main matter was time barred. And so what remained was this nebulous promise about keeping Dr. Taub happy. By significant contrast, the real estate scheme, like each of our schemes, is focused on a particular piece of legislation. And the Court at pages 67 and 68 of the silver decision walked through the facts which support its finding of harmlessness beyond a reasonable doubt, and there's basically four things they look at. First, that silver had power over the key funding and laws. Dean Scalise had the same power on the Senate side. Second, that there was circumstantial evidence of the timing of silver's acts and the referrals. Here, for the reasons we've talked about with respect to the Glenwood scheme, the timing was even tighter. And I can talk about the other schemes in a moment as well. Third, there was this side letter that was evidence of consciousness of guilt. And if we had nothing in this trial, we had evidence of consciousness of guilt. We had numerous wiretap calls where the defendants are talking in code, sending e-mails about not-for-e-mails, lying to their staff. We had oodles of consciousness of guilt evidence in this trial. And fourth, there's testimony from Glenwood representatives about how not signing this side letter could lead to, quote, repercussions legislatively. In this trial, with respect to each of the schemes, we had equivalent testimony. Derego testified about his fear of legislative repercussions, and in context, it's clear he's talking about 421a. That's at 4602 of the appendix. Bonomo testifies about his fear of legislative consequences. That's at page 5527 to 28 of the appendix. And Bjornoff-White, who works for ABTEC, testified that he felt like he was being held hostage by the threat to block the county contract. That's at page 4989 of the record. We also have the goodwill instruction, as they did in Silver, and we have abundant evidence with respect to each of these schemes that supports the harmlessness. And what about with regard to Adam and the extent of his knowledge? You could look at the record possibly and think a father's helping son. The son knows that, you know, arrangements are being made, and he proceeds to accept money and show up or not show up at various jobs. But what does the record show about that could convince us, beyond a reasonable doubt, that any error has been harmless as to him? Well, I think there's two separate questions here. One is the jury instruction question, and one is sufficiency. With respect to sufficiency, I would say, look, this Court has already considered and rejected the exact same argument on the first appeal. We ran through a laundry list of facts that supported a reasonable inference that Adam Scalise had knowledge about the things his father, the specific things his father was doing for these companies, and that was more than sufficient for a reasonable jury to find his guilt. Now, to the extent that we're applying a question of harmless error review to Adam Scalise's knowledge, first, there's no chance that it's harmless with respect to the Abtec scheme, because there are multiple wiretap calls where Adam Scalise is actually briefing his father.  There's no chance that it's not harmless. Yes, Your Honor. Where, you know, Adam Scalise's whole job with Abtec, it was memorialized in his contract, was to help with county — excuse me, State legislation. Obviously, the hostage email — Mr. Kenney's concerned about PRI and Glenwood. So would you — I think he's talking about PRI and Glenwood. Yes, Your Honor. And I think that the evidence that we cite in our brief is more than sufficient to find both sufficiency — How specific does his knowledge have to be? You know, I've got a dad. He's powerful. He's a State senator. He, you know, I can complain to him, and he'll make sure he'll use his influence. I mean, why isn't that enough? Why isn't that what the extent of his knowledge, as opposed to the more specific knowledge of how he's going to do it? Your Honor, I don't dispute that that would be sufficient, but even if we had to prove something more, even if we had to prove that he knew about — Well, maybe we do have to prove more. I don't know. Well, and if we do, Your Honor, I think we did. I mean, you know, there has to be knowledge that roughly equates, presumably, with the acts that are sufficient to convict. I think that's right. But even if the holding is that Adams-Skelos has to know about what the identified matter is, I think we clearly proved that. I mean, if you look at the trial evidence here, and one of the best ways to look  coordination every step of the way with respect to all these schemes between Adams-Skelos and Dean-Skelos, with respect to Glenwood and PRI specifically, you know, when the investigation began to become public, Adams-Skelos had a meeting with Bjornoff White, where he talked about how it was a good thing he didn't have any, quote, real estate ties to Charlie Durego, the government's key cooperating witness. I think that was certainly sufficient to support a finding that Adams-Skelos knew this wasn't just sort of, well, my father's powerful. What he's powerful about is the real estate legislation that is critical to Glenwood. Same with respect to PRI in terms of, you know, the way Adams-Skelos approaches his job, talks about having an arrangement with his supervisors, excuse me, with the company's CEO, I think is certainly sufficient to support the inference that he in fact knew. And when you look at that in the context of the whole trial and the coordination between the two defendants, constant phone calls, e-mails, discussions about the case, he did make that showing. If I may briefly, Your Honor, I think that is everything I wanted to cover. Unless Your Honors have further questions, I'd be happy to rest on our briefs. Thank you very much. Your Honor, I'm so sorry. There's one point I did neglect to make, which is just with respect to the ABTEC scheme, and obviously we'll hash this out in a little more detail in our submissions, but, you know, the quotes that the defense counsel are talking about in terms of, well, there's the hostage e-mail, sure, and I don't think there can be any dispute that that was about a specific matter because it's an explicit threat to block a specific county contract, but what are the things that Adam-Skelos, or excuse me, Dean-Skelos also does for ABTEC after that? There's two things. He pressures Ed Mangano, the Nassau County executive, to release funding under the contract, and he votes for state budget legislation, which provides funding for which the contract will be eligible. And so all three of those official acts that we pressed in the ABTEC context are directed at the same matter, the contract, which was clear from the exception. And the one other thing I want to just confirm was that on the supplemental briefing that we also have eight pages double-spaced? Yes, please. Thank you, Your Honor. Okay, thanks. Ms. Shapiro. Just a couple of quick points. First, with respect to the standard, I think, as Your Honor said, Judge Kearney, I don't think there's really much dispute between the quotes from Nieder that I read to the Court, which were reaffirmed in this Court's decision in Quattrone and the way Mr. McKay is characterizing the standard. And the point is that this is the government has to prove that, beyond a reasonable doubt, that a rational jury couldn't have acquitted. And this jury was out for three days. Let's not forget that. The defendant testified. I'm not going to go into chapter and verse, but many of the characterizations you heard from government counsel about the meetings before the June 11th legislation are hotly disputed. He's not actually quoting the testimony. Let me interrupt for just a second. This is not sufficiency. Yes. Do you agree as to the counts of conviction under 666 that there is no impact? So I was getting to that. So with respect to 666, I just want to be clear, there are two different points that this counsel has made. One is he's arguing that the bribery counts are valid and the instruction isn't deficient, and we disagree with that very vigorously. And this Court, in the first Skelos case, in which in this the 666 counts, like the other counts, incorporated the definition of official action, this Court held that McDonnell applied because the government had requested that, and its theory was a theory of bribery and furtherance of official action. In the Thien case in footnote 15 and the Ng case, which a government counsel referred to in footnote 25, the Court's both of those cases specifically made clear that the reason they cite to Skelos 1 and say that's a different case because of the government's theory, in this case, the same thing happened. The government asked the judge to charge a requirement of official action under the McDonnell definition in connection with the 666. It did have the same defect we identified in the other counts. So as to bribery, I think there's really no dispute that the instruction was incorrect. There can be no dispute under this Court's prior three cases, including in this the earlier version of this case. With respect to gratuities, we believe that there was the gratuity counts were also defected with the error because the Court's instruction was very confusing and referred back to an official act instruction that itself was defective and referred to as opportunities arise, but we certainly can see that we're not specifically arguing that the gratuity instruction itself was legally incorrect. But I do just see my time is up. Can I just address the other point? Kaganon, sure, yeah. The point I wanted to make was that there's disputes about what happened in these conversations, and moreover, there's a long history of Mr. Scalia supporting this 421a legislation, and indeed, the reason Glenn would first met with him some six months before that was to celebrate the Republican control of the Senate because they knew he supported them. But having said that, the other thing I want to stress is that in the Silver case, it was very different because the defendant didn't testify. There wasn't alternative evidence, and unlike in this case where there's no payment for 18 months after the legislation is passed, there, there was a much closer nexus in time, and indeed, if you take a look at the Silver briefs, you'll see that harmlessness as to the real estate scheme is not actually briefed. The defendant there was arguing that the evidence was insufficient. We are not making that argument. That also is different from what Adam Skelos is arguing. Thank you, Your Honor. Okay. Thank you very much. Thank you for your arguments. We'll take the matter under advisement. We're going to take a brief recess, a few minutes, and we'll be back to hear argument in the remaining two cases.